## OTIS CHALK v. THE STATE.

### No. 1160.    Decided October 16th, 1895.

#### 1.   Murder—Continuance.

On a trial for murder, an application for continuance was properly refused where it appeared that the absent witness did not see the difficulty, and was so far away that, while he could hear the altercation, he could not understand the language, or which of the parties used the language.

#### 2.   Evidence—Dying Declarations—Predicate—Bills of Exception.

Where an objection to the admission of dying declarations in evidence was, that a sufficient predicate for their introduction had not been laid, and the court in qualifying the bill of exceptions, refers to the statement of facts as to the predicate, the same will be considered in determining the sufficiency of the predicate.

#### 3.   Same—Practice.

Where, on a preliminary inquiry as to the sufficiency of the predicate for the admission in evidence of the dying declarations, the jury had been retired, and defendant objected to the refusal of the court to permit his witness to testify, that deceased inquired, if the doctor was coming, and expressed a hope that the doctor might do something for him. Held: In order to have made the exception to the ruling available, the bill of exceptions should have shown, that when the jury were brought back into court, the offer to introduce this testimony was renewed by defendant; and, on refusal of the court to permit it, an exception should have been reserved to such refusal.

#### 4.   Same—Question by Trial Judge.

On the examination of a witness as to the dying declarations, it is not error for the judge to inquire of the witness, as to the condition of the mind of deceased at the time the declarations were made.

#### 5.   Same—Remarks by the Court.

On the examination of a witness with regard to the mental condition of the deceased at the time the dying declarations were made, an objection was made by defendant's counsel to the answer of the witness; and the court remarked, that "it made no difference when the testimony came into the case so the jury got the benefit of it." Held: It cannot be seen how the remark was prejudicial to defendant.

**6.   Declarations of Deceased—Res Gestæ.**

On a trial for murder, where it appeared that the witness heard the shots, that a party immediately came to witness and told him where deceased was, that he at once went to him, found him lying in the road wounded and bleeding; and that, at farthest, 15 or 20 minutes had not elapsed from the time he had been wounded.   Held: The statements of deceased to the witness were unquestionably admissible in evidence as part of the res gestæ.

**7.   Declarations by Defendant.**

Where probably as much as an hour had elapsed after the shooting, during which time defendant had finished loading his wagon, and driven it three-quarters of a mile.   Held:  His declarations and statements made to a witness were inadmissible as evidence, and were properly refused by the court.

**8.   Remarks of the Court.**

Where a bill of exceptions shows that defendant objected to remarks of the court with regard to a portion of the testimony of a certain witness, to the effect, that it was immaterial, and had nothing to do with the case, and was consuming the time of the court.   Held:   That the bill should have shown what the testimony was—and not doing so, this court cannot presume it was material, or that the court's remarks concerning it were calculated to prejudice defendant.

**9.   Acts and Conduct of Deceased.**

The exclusion of evidence to the effect that, several days before the homicide, deceased and another Mexican came to defendant's house to get pay for work, and, not finding him at home, deceased appeared to be angry, and struck himself in the breast and cursed in Spanish, was not material or prejudicial to defendant.

**10.   Evidence.**

On a trial for murder, where it appeared that the defendant was either guilty of murder or had acted in self-defense, and the difficulty originated concerning deceased cutting wood for defendant, evidence as to the terms of the contract, to cut the wood, between the defendant and the Mexican, who sublet the contract to deceased, was wholly immaterial.

**11.   Same—Animus of Defendant.**

On the trial for the murder of a Mexican, as pertinent and tending to show the animus of the defendant, it was competent to prove, that a week or so before the killing he had attended and participated in a couple of meetings, the object of which was to get rid of the Mexicans in the community, because they were working too cheap.

**12.   Improper Argument of Counsel.**

A defendant cannot be heard to complain of improper argument by the State's counsel, which is occasioned and justified by the argument of his own counsel.

**13.   Evidence—Carrying Deceased's Clothing Into the Jury Room.**

It is not error to authorize the carrying of deceased's coat, which had been used in evidence, into the jury room.

**14.   Self-defense—Threats—Charge.**

On a trial for murder, where the defendant has himself testified, that he shot deceased while the latter was making a violent and dangerous assault upon him with a knife.   Held:  He cannot be heard to complain that the court erred in omitting the charge upon threats by deceased in connection with his right of self-defense.

**15.   Self-defense—Abandonment and Renewal of Attack by Deceased—
        Charge.**

Where the testimony for the defense showed, that the fight was a continuous one; that at one time during its progress the knife of deceased was knocked out of his hand, but that he immediately attempted to regain it; and there was no suspension of hostilities, it was not error to refuse or fail to charge upon an abandonment of attack by deceased and a retreat for the purpose of arming himself for a renewal of the attack upon defendant, where a correct and proper charge applicable to the facts had already been given by the court upon self-defense against actual and apparent danger.

16.   Self-defense—Charge.

Where the theory of the defendant was self-defense in resistance to an attack by deceased with a deadly weapon, arousing reasonable expectation or fear of death or serious bodily injury, a charge was proper and sufficient, which instructed the jury, "If deceased was armed at the time he was killed, and was making such attack on defendant; and if the weapon used by him, and the manner of its use, were such as were reasonably calculated to produce death or serious bodily harm, then the law presumes the deceased intended to murder or aimed to inflict serious bodily harm upon the defendant."

APPEAL from the District Court of Bell.   Tried below before Hon. W. A. BLACKBURN.

This appeal is from a conviction for murder in the second degree, the punishment being assessed at five years' imprisonment in the penitentiary.

The indictment charged defendant with the murder of P. L. Medrano, in Bell County, on the 8th day of August, 1894, by shooting him with a pistol and with a gun.

The statement of facts is quite voluminous, but the main features of the evidence will be found in the following testimony:

Mrs. J. M. Overstreet, sworn for the State, said:   "I am the wife of J. M. Overstreet, and we live in a camp on Mr. R. L. Chalk's place, three miles north of Belton.   On the morning of August 8th, 1894, about 9 o'clock, as I was going from our camp to Mr. F. D. Wheeler's, I saw a Mexican in the road.   He was standing when I first saw him, but he soon sank down on the ground.   He was about 150 yards from Mr. F. D. Wheeler's house.   As I went by, the Mexican said to me, "Tell some one to come to me, that I am shot; tell them to come quickly."   I did not stop.   He said this as I passed by him.   I did not see him with any hat.   I did not see any hat at all near him.   I walked hurriedly on, and saw Ellis Wheeler near his father's house, and told him about the Mexican.   He then went down to where he was.   I passed there again that day, but said nothing to the Mexican, nor he to me.   The Mexican was at our camp a day or two before this; while there he said nothing about Chalk, and I did not see him with a knife or watch."

Ellis Wheeler, sworn for the State, said: "I am a son of F. D. Wheeler, and live with my father on Mr. R. L. Chalk's farm, three miles north of Belton, Bell County, Texas.   On the morning of August 8th, 1894, Mrs. J. M. Overstreet told me, near my father's house, that there was a Mexican, who had been shot, lying on the roadside near our house, and that the Mexican wanted some one to come and help him. I went down to where the Mexican was lying, some 100 or 150 yards from my father's house.   I found the Mexican lying down by the roadside, and asked him what was the matter.   The Mexican said he was shot; that Otis Chalk had shot him.   The Mexican told me that he was bound to die; that he could not get well.   He said he had some seven or eight loads of wood cut, and that he wanted to sell it to Otis Chalk for whatever Chalk thought was right, but that Chalk would not buy it all.   Then, he said, he told Otis Chalk that he had to sell it and get his

money, as he wanted to leave that day, and for him, Chalk, to take the wood, and pay him whatever Chalk thought was right for it. Then Chalk said, 'you get away from here, you God-damned Mexican son-of-a bitch.' The Mexican said, when Chalk said this to him, he (the Mexican) said: 'all right; I don't want to have any trouble, and I will leave,' and turned to go; and as he did Chalk pulled his pistol and he ran, and Chalk shot at him, and shot him in the back as he ran off; and then, as he ran, Chalk shot him again. The Mexican said he was not armed; that he had neither knife nor pistol, and that he did not want to have any trouble. That he did nothing to Chalk to cause Chalk to shoot him. The Mexican told me repeatedly that he was going to die, and said he was not afraid to die. He spoke very good English and talked rational. He talked with good sense. I asked him if he wanted a doctor, and he said it was no use. After talking to the Mexican awhile, I went and got a horse and came to town after my father; as I came to town after my father, I overtook Chalk near the M., K. & T. railway track in Belton. He had wood in his wagon. I found my father at Mr. Ellis' store, and told him about the Mexican being shot; and pretty soon thereafter we went out together. When we got out to where the Mexican was lying, I went on to our house to dinner. After dinner I went back out to where the Mexican was. It was about 9 o'clock in the morning when I first saw the Mexican shot. No one was with him at that time; afterwards Mr. Overstreet and others came. I saw this same Mexican at my father's house, the same morning about 7 o'clock. There was nothing the matter with him then. He was not shot at that time. He was on my father's gallery, and was trying to sell him some wood. I did not see the Mexican with any arms at my father's that morning. I did not see him with either knife or pistol; nor did I see him with either knife or pistol where I found him lying; nor was there any there at all, as I saw. I was at the Mexican's camp the day before he was killed. His camp consisted of a wagon sheet stretched over a pole. His camp was about half a mile from where he was when I first saw him after he was shot; and about half a mile from our house. I did not see the Mexican with a knife at his camp. I never saw the Mexican with a knife nor pistol. I didn't see any hat where the Mexican was lying. I don't know what became of his hat; I have never seen it."

Dr. Allen, the physician, testified, that there were two wounds on the body of deceased, both shot from behind. One in the back above the hip, and which came out near the navel (the fatal wound); the other in the leg. This witness said, when he reached the Mexican he was suffering greatly, but his mind was clear. He was a man above average in intelligence. Seemed perfectly composed, and said he was not afraid to die. Seemed impressed with the idea that he was going to die. Saw him after he died, about 5 p. m., same day.

F. D. Wheeler testified to deceased's dying declarations to substantially the same effect as did his son, Ellis Wheeler.

Defendant testified in his own behalf, as follows: "I am 21 years

old; I have lived in Belton ever since I was 6 or 7 years old; R. L. Chalk is my father; I have always lived with him. I knew deceased, but didn't know his name. I saw him the first time on Saturday before the difficulty on Wednesday. I talked with him three or four times that day; the first time I saw him was down at the southeast corner of the public square; he and a small, lighter colored Mexican came to me; he told me he had six or seven loads of wood cut; that he had taken the other Mexicans' contract and was cutting the wood in their place. He wanted me to pay him for all the wood he had cut. I told him I could pay him for it only as I hauled it and sold it in town. I then told him I would see him after dinner. About 2 o'clock he came to me again and I paid him fifty cents for a load of wood Will Jeffreys had gotten from him. I gave him an order for it in M. Smith's saloon. Henry, the Mexican (Beltram), was there at the time, and I told deceased I could pay him for the wood only as I hauled it. That was my contract with the other Mexicans. That I would haul it all the next week and pay him for it by the load as I hauled it. I was to pay him fifty cents a load for it. He did not like this, but said nothing more about it.

"After this he came to me again with the small Mexican, who could not talk English, and the deceased talked to me for him. The small Mexican claimed that I owed him two dollars for cutting wood. I told him I had paid his partner for all the wood they had both cut, and that I couldn't pay him for the wood again. I talked with him for some time, and tried to explain it to them, but they made out like they couldn't understand it. They came back a second time, and I told it over to them again, telling deceased all about the trade Henry, the Mexican, had made with them for me. They came back a third time, and deceased seemed to be pushing the matter on me for the other one, and I got tired of it, and said to him: 'God damn you, go away, and let me alone; I won't talk with you for this Mexican any more. Go and get Henry, who made the trade with me for him, to talk for him, and I will talk to him about it.' When I said this, deceased muttered something in Spanish and turned off, and I didn't see any more of him that day. On Tuesday evening, before the difficulty on Wednesday morning, Will Jeffreys told me I had better watch deceased; that he talked to him that evening, when he was out in the brake getting a load of wood, and deceased asked him where I was, and said I had promised to haul the wood right away and pay him for it, and I had lied about it; that he didn't like me anyway; that I treated a Mexican like a dog, and if I didn't haul the wood and pay him for it he would kill me.

"On Wednesday morning, as I drove out to get a load of wood, I met F. D. Wheeler, and he told me that deceased had been trying to sell what wood he had cut out there, and I told Wheeler deceased had no right to sell the wood until he paid for the timber it was cut out of. I drove on out to deceased's camp, where I found him. When I drove up I said, 'Good morning, 'hombre,'' and he asked me whose wagon that

was. I told him it was mine, and that I wanted a load of wood. He walked ahead of me and showed me the way to drive up to a pile of wood about one hundred yards from the camp. I drove up on the south side of the pile of wood with my horses' heads pointed towards the west. I got out and unhitched my horses' traces, and deceased and myself commenced loading the stove wood into the wagon. I stood on the west side of the wood, next to my horses, and he stood on the east side of the pile, opposite the hind part of the wagon. As I stood facing him there was a clear space of some six or eight feet behind me and west of me, and then there was a pile of brush and some shrubs, and this brush and shrubs extended around to my left and north of me, forming a sort of enclosure from near the right hand horse out north and around on the north side of the pile of wood. Back of the deceased, and east of him and northeast of him, the ground was open and clear for a considerable distance.

"After we had been throwing in wood for some time, he asked me if I was going to haul all the wood that day. I told him no, I couldn't haul it all; that I had to sell it as I hauled it. He said that he wanted me to haul it all, that he had six or seven loads cut and he wanted the money for it so he could go away. I told him again that I couldn't get it hauled that day, but that if it didn't rain I would get it hauled by Saturday, and would pay him for it as I hauled it. He said if I didn't agree to haul it right away he would sell it to somebody else, that he had a man that wanted it. I told him no, he couldn't sell it to anybody else, that I would haul it by Saturday as I had promised, and pay him for it. That was the contract, and he had no right to sell it; that the wood was mine. He said that he was going to sell it and get his money; that I couldn't beat him like I did the other Mexican. I told him I didn't beat the other Mexican, that I paid his partner all I owed both of them and they cut wood together. He said: 'Yes, you did beat him.' I said: 'You are a God damn liar, I did not beat the other Mexican,' and when I said this we both stopped throwing in wood and both stood up straight. I thought he was going to make a break at me, but he said, 'that's all right; that's all right,' and didn't do anything, and I stooped down and gathered up a double handful of wood, and as I raised up to throw it in the wagon, he jumped at me with a knife in his right hand and cut at me. I jumped back to get out of the way of the lick and hollered 'look out!'" He came at me again, cutting at me with the knife, and me running back and knocking off the licks with my left arm, and dodging them. After the first lick with the knife, I got a pistol out of my pants, and while he was making the second and third licks I tried to shoot him, but I couldn't cock the pistol with my right hand; it either got hung some way, or I was scared so bad I couldn't get the hammer back with my thumb. I finally got back into the brush north of the horses, and west of the pile of wood as far as I could go, and as he raised the knife up to strike me, I struck him on the arm and knocked the knife out of his hand; the knife fell to his right and a little back of him, about six

or seven steps, and he turned and ran towards it.   When the knife flew out of his hand, I got time to get both my hands to the pistol for the first time, and got it cocked.   I hollered at him when he was about half way to the knife, and told him to let the knife alone.   He didn't stop, and I held the pistol in both hands and fired at him.   When I fired the first shot he was within one or two steps of the knife, and was reaching out towards it; he still went down after the knife, and as he was getting it I fired at him again.   He got the knife in his right hand, and as he raised up he started to turn toward me, and I fired the third shot.   After this he pulled his hat off with his left hand, and with the hat in his left hand and his knife in his right hand, he ran off through the brake.   The knife was a large broad blade pocket knife, the blade about three and one-half inches long and hawk-billed; and the first time he struck at me, he cut slashing fashion and cut my coat in front.   I don't know how he struck the other licks, but afterwards found my left coat sleeve cut. After he ran off I threw in about one-fourth of a load of wood; hitched up my team and drove on to Belton.   I didn't know whether deceased was hurt or not; I didn't think he was from the way he ran off.   I didn't know he was hurt till after I drove to Belton and sold my load of wood.   I came on to Belton and sold my load of wood, and drove back upon the square.   I then heard that deceased was badly hurt, and I drove home and took out my team and then came over to the sheriff's office, and after that Mr. Denman took me to jail."

Cross-examined by the State, defendant testified as follows:   "I was before the grand jury about three or four weeks before the time of the difficulty.   I stated there that I was present at a meeting in the old oil mill, which adjourned till the next night to a room over Perry & Justice's saloon.   I didn't state I was there thirty minutes.   I said I was there fifteen or twenty minutes.   I did not state that I had heard on the streets before I went to the meeting that the object of the meeting was to devise ways and means of running the Mexicans out of town because they were working too cheap.   I did not state before the grand jury that I knew the object of the meeting before I went up there.

"The deceased was in three feet of me when he struck at me the first time, about two feet the second time and about the same the third.   The first blow cut my coat across the left breast, the second cut my left coat sleeve and down the sleeve.   I had my arm up.   I do not know where the third cut, unless it was in the edge of the first cut.   I wore the coat that morning for two purposes.   It was raining and I wore it to keep from getting wet.   I also wore it to conceal the pistol.   I had only a thin undershirt on under the coat.   It was hot weather."

Re-examined:   "I took no part in the meeting referred to, I went there out of mere curiosity, and I did not stay there after the meeting was called to order.   Somebody hollered out that all who couldn't keep a secret must leave, and I left.   I had nothing against the Mexicans and had no reason to want them run out of town because they worked too cheap.   It was to my interest for them to work cheap, for I had been

hiring them for the last twelve months.  I have paid out about $300 clearing land and cutting wood and have paid it nearly all to Mexicans. I never had the least trouble with one of them till the trouble with deceased.  I always paid them what I promised them and there was never any dissatisfaction.  The Mexican, Henry Beltram, hired nearly all of them for me, he could talk English and talked with them for me."

Defendant objected to the testimony of Ellis Wheeler as to statements made to him by deceased, "because the said evidence was hearsay and was not admissible as res gestæ; because the evidence showed that a considerable length of time had elapsed from the shooting till the time of the statement and that deceased had talked with Mrs. Overstreet before talking with Ellis Wheeler and that he, deceased, had remained sitting and lying on the side of the road for a considerable time while Mrs. Overstreet went after Ellis Wheeler, and was not admissible as a dying declaration; because there was no evidence that deceased was conscious of the immediate approach of death, but the evidence showed that all expressions of deceased as to whether he was going to die were made after the statements as to how he was shot."

This bill of exceptions was qualified as follows:

"The testimony in this case shows that the shooting took place between 8 and 9 o'clock; that about 9 o'clock Mrs. Overstreet passed the Mexican in the road, the latter saying that he had been shot and wanted help; that she told him she would get some of Mr. Wheeler's folks, and did hurry on about 150 yards and tell Ellis Wheeler about it, who hurried to the deceased, who had fallen to the ground before he reached him. The circumstances make it conclusive to my mind that the Mexican had not seen any other person but Mrs. Overstreet before the conversation with Wheeler, and it appearing to the court that he was a stranger about Belton, a Mexican, and in the very jaws of death, and realizing the fact and being the first person with whom he had conversed, and from all the facts and circumstances in the case, the court believes only a few minutes after he was shot, the evidence showing that the firing was heard at about 9 o'clock, and this conversation having occurred at about the same hour, and being so ignorant of our laws and so apprehensive of immediate death, I cannot believe his story was concocted."

While the counsel for defendant was arguing the admissibility of the evidence of the witness Jeffreys, as set out in defendant's bill of exceptions No. 6, and after all of said Jeffreys' testimony had been given in before the jury, including testimony of threats to kill Chalk, made by deceased the evening before the fatal difficulty, and communicated to Chalk the same evening—the court made substantially the following remarks to defendant's counsel in the presence and hearing of the jury:

"Go on with the examination of the witness.  This whole thing he has been testifying to is irrelevant and immaterial, and has nothing to do with the case," and upon counsel for defendant excepting to the remarks of the court, the court said:  "I say again the whole of his testimony, except as to the threat, has nothing to do with the case," to

which remark of the court defendant objected, because the said remarks were uncalled for, unwarranted, and were calculated to prejudice the jury against the defendant and cause them to disregard the testimony of the witness, Will Jeffreys.

The court allowed this bill of exceptions with the following qualifications: "The foregoing exception qualified in this way: Defendant's counsel asked a great many questions deemed irrelevant—the State's counsel would object, and defendant's counsel informed the court that the irrelevant matter was only preliminary to relevant matter, and was therefore admitted, but when heard the threat and conversation connected with it was all that was admissible, and the court then told counsel to go on with the case; that it had been admitting all this irrelevant matter in the hope that it would be the quickest way to get over the wrangle between counsel, and spoke of the amount of irrelevant matter that had been admitted, and to stop any more of the same kind, told counsel that none of it was admissible except the portion referring to the threats, which was admitted."

Another matter, shown by bill of exceptions, is as follows:

"The State offered to prove by defendant, that he (defendant) was summoned before the grand jury of Bell County at the present term of this court about three or four weeks before the date of the fatal difficulty, and there testified that he (defendant) was present some months before that date at a meeting at the old oil mill, which was adjourned to the room over Perry & Justice's saloon, and which was held for the purpose of devising ways and means of running the Mexicans out of Belton, because they worked too cheap; and the same facts by J. D. Basil and Elisha Embree, to which the counsel for the defendant objected for the following reasons, viz: Because the said evidence was irrelevant and inadmissable, and was calculated to mislead the jury. And the court overruled defendant's objections, and admitted the said evidence to the jury. This bill was allowed by the court with the following qualifications: 'The testimony is believed to have been admissible for the purpose of showing the general reckless disregard the defendant had for and prejudice against Mexicans in general, and as a circumstance the jury might consider in ascertaining whether or not the defendant was actuated by malice.' "

Defendant's bill of exception No. 11 contains substantially the following:

"While W. T. Shannon, the District Attorney, was making the closing speech for the State, in referring to a portion of the argument of counsel for defendant, which was as follows: 'That the testimony of the Wheelers and Overstreet was not reliable as to what they said deceased stated, because they had stated in their evidence that Dr. Allen and Sheriff Sparks were both present, and that Sparks took down the statements of deceased in writing, and that it was a part of the record in the case, and a fact which the jury had seen themselves, that Sparks had been called as a witness by the State, and had testified that he was

there, and took down the statement in writing, and the written statement had been brought out by Mr. Shannon before the jury; and then the court had ordered the jury taken from the court room that Mr. Sparks might be examined by the court to see whether the statements of deceased were dying declarations or not; and that they had never heard a word from Sparks or Allen since about the statements of deceased; but that when the Wheelers and Overstreet came upon the stand, they covered the case like regulars, and swore as if by note, that deceased said he was bound to die, and so swore these statements in before the jury as to what deceased had said; that truthful men like Sparks and Allen didn't swear their statements in before the jury, but it took such men as the Wheelers and Overstreet to do that!' "

Mr. Shannon said: "Mr. Durrett has argued to the jury that the Wheelers' and Overstreet's statement is false, and that Sparks' is true. I now say that you know that the State attempted to introduce the written statement of Mr. Sparks, and Mr. Durrett objected to it. What did he object to it for if it was true?" To which remark counsel for defendant objected on the ground that it was out of the record and calculated to prejudice the jury against the defendant. Upon which the court remarked: "That counsel for defendant had gone out of the record, and the State's attorney had a right to follow him out and answer his argument," in the presence of the jury.

To which remark of the court, counsel excepted, and the District Attorney then said:

"I now propose to offer in evidence to the jury the statement written out by Mr. Sparks and see if counsel for defendant is willing to take that instead of Wheeler's and Overstreets."

To which remark defendant's counsel objected to the court, and asked that counsel for the State be reproved and that the jury be instructed to disregard said remarks, and, in answer to said objection, the court in the presence and hearing of the jury, said:

"No; you have brought it on yourself, and Mr. Shannon may present it to the jury, and, unless you object to it, he can read it to the jury."

To which remark of the court defendant's counsel excepted, and the District Attorney presented the written statement taken down by Sheriff Sparks, and defendant's counsel objected to its introduction on the ground that no predicate had been laid for its introduction as a dying declaration, and it was excluded by the court; and the District Attorney then turned to the jury and said:

"Now, gentlemen, you see whether it is the State or the defendant that is afraid of the truth."

This bill of exception was qualified by the court, as follows:

"The foregoing exception given with this statement, that the written statement of Sparks was excluded on objection of defendant's counsel, his reference to it was out of the record, and the court allowed the District Attorney to follow him in regard to it."

*R. L. Chalk, Saunders & Durrett* and *J. P. Kinnard* and *Mc-Mahon & McMahon,* for appellant.

*Mann Trice,* Assistant Attorney-General, for the State.

[No briefs for the State with the Record.—Reporter.]

HENDERSON, JUDGE.—Appellant in this case was tried under an indictment charging him with murder, and was convicted of murder in the second degree, and his punishment assessed at five years' confinement in the penitentiary, and from the judgment and sentence of the lower court he prosecutes this appeal. The appellant assigns a number of errors, and we will consider them as presented in the bill of exceptions, in the order in which they are presented. Appellant claims that the court committed an error in forcing him to trial in the absence of the witness Juan Flores. It appears that the witness was subpœnaed. This was sufficient diligence, under the circumstances of the case; but, in our opinion, the absent testimony was not material. He did not witness the difficulty, and was so far from it that, while he could hear the altercation, he could not understand the language used by the parties, nor which one used such language. The contention, doubtless, is that the testimony of said witness would corroborate the appellant's evidence, but we fail to see its materiality in that respect. Appellant alleges error on the part of the court in admitting the testimony of Dug Wheeler as to the dying declarations of deceased, claiming that no sufficient predicate was laid for such admission. The bill of exceptions presented to the court does not, perhaps, show a sufficient predicate; but the court, in his qualification of said bill, refers to the evidence of this witness and the statement of facts to show the predicate, and the testimony here referred to, and made a part of the bill, shows an ample predicate for the admissibility of said dying declarations. In appellant's third bill of exceptions he claims that, in laying a predicate for the admission of said testimony, the court erred in refusing to permit the appellant to prove by the witness Dug Wheeler, upon his examination before the court for the purpose of determining the admissibility of the dying declarations of deceased, that, during the conversation in which deceased made such declarations, deceased inquired if the doctor was coming, and expressed a hope that the doctor might do something for him. Conceding that this testimony was material, as expressing a hope of recovery on the part of the deceased, which is questionable, especially in view of the testimony of this and other witnesses as to the condition and expressions of said deceased just prior to his death (see Hunnicutt v. State, 20 Tex. Crim. App., 632), yet we find, by reference to this bill of exceptions, that this proof was offered before the court, and by referring to the ensuing bill of exceptions (No. 4), we find that, while a predicate was being laid by the testimony of this witness, the jury were retired, and the bill fails to show that, when the jury were brought in, the offer to introduce this testimony was renewed before them. In our opinion

in order to have rendered the exception available, this should have been done, and on refusal of the court to permit it, an exception should have then been reserved to the action of the court.   See Hunnicutt v. State, supra.   In the appellant's fourth bill of exceptions he complains that, during the progress of the examination of the witness Dug Wheeler, and after he had testified as to the dying declarations of deceased, the court inquired. of said witness as to the condition of the mind of deceased at the time he made the declarations.   Defendant insists that this was a part of the predicate, and that the court acted improperly, and to his prejudice, by interrupting the examination, and asking the question at such time.   The court explains this bill in his qualification thereof, stating that he asked the question because, during the examination of said witness Wheeler, it occurred to the court that the deceased was in a sinking condition, and that it was possible that his mentality was thereby impaired.   In this action of the court we see no error.   In this connection, in appellant's thirteenth bill of exceptions, the appellant objects to the remark of the court made at the time the question was asked the witness Wheeler as to the mental condition of the deceased.   After the answer of the witness, and on objection by counsel, the court stated that it made no difference when the testimony came into the case, so the jury got the benefit of it.   We do not construe the remark as prejudicial to the rights of the defendant.

The appellant, by his sixth bill, objects to the testimony of Ellis Wheeler, who testified as to statements made by deceased to him as to the cause of his wounds.   The bill of exceptions shows that this statement, made by deceased to Wheeler, to which he testified, was very shortly after the wounds were inflicted.   The witness heard the shots which caused the wounds, and the evidence shows that the deceased, immediately after he was wounded, ran out from the brush into the road, and almost immediately he was found by Mrs. Overstreet, who at once went to where Ellis Wheeler was, which was not more than 150 yards distant, and told him where deceased was, and that he at once went to him, and found him lying in the road, and bleeding from his wounds, when the statement in question was made to him by the deceased.   This could not have been, at the furthest, exceeding fifteen or twenty minutes after the time he was wounded, and, according to the statement of the judge in his qualification of the bill of exceptions, it was even less than this; so that, in our opinion, the testimony was unquestionably admissible as part of the res gestæ.   See Warren v. State, 9 Tex. Crim. App., 619; Washington v. State, 19 Tex. Crim. App., 521.   Nor, in our opinion, did the court commit any error in rejecting the testimony of Will Jeffreys, offered by the appellant to prove what the appellant told him, after the difficulty, about it.   It appears from the record, as to this testimony, that, after the shooting by appellant of the deceased, he then finished loading his wagon with wood, which must have taken him some time, and that thereafter he drove his wagon, loaded with wood, about three-fourths of a mile, so that a considerable time—probably as much as an

hour—elapsed between the time of firing the fatal shots by appellant and his meeting with Will Jeffreys.. Besides, he is shown to have engaged in other employments, as the loading of his wagon and the driving of his team, between the two events. See Stephens v. State, 20 Tex. Crim. App., 255. In this connection the appellant objected to the remarks of the court as to the testimony of Will Jeffreys; said remarks, in substance, being that the testimony was immaterial, and had nothing to do with the case, and was consuming the time of the court, except the testimony as to the threats of the deceased against appellant, to which said witness, Jeffreys, deposed. The bill does not show the other testimony, and we cannot presume that it was material, or that the remarks of the court in connection therewith were calculated to prejudice the appellant.

In appellant's ninth bill of exceptions he complains that the court committed an error in excluding the testimony of George Evans, to the effect that, on Saturday evening before the Wednesday of the killing, deceased came to appellant's house with another Mexican, inquiring for defendant, and said he wanted appellant to pay him for six or seven cords of wood, and on being informed that appellant was not at home, appeared to be angry, and struck himself in the breast and ·cursed in Spanish. This testimony, in our opinion, shows no threat, and we fail to discover its materiality. In view of the fact that, on the same evening, and after this occurrence, deceased saw appellant, and had a talk with him on the subject of this wood, we fail to see how the exclusion of the occurrence about which George Evans would have testified was calculated to prejudice the appellant. Nor, under the circumstances in this case, was it material to show the terms of the contract between the appellant and the Mexican, who turned over the contract to cut the wood to the deceased. If the State's testimony was to be believed, the appellant was guilty of murder, and if the appellant's evidence was to be credited, he was authorized to do what he did in self-defense, regardless of any con-tract with reference to cutting wood. The proof offered by the State, showing that, some three weeks before the homicide, appellant attended a couple of meetings, and participated therein, the object of said meetings being to get rid of the Mexicans in that community, because they were working too cheap, we think, was admissible as evidence tending to show the animus of the appellant towards Mexicans, the deceased being a Mexican, and, according to the testimony · offered by the State, the homicide occurring without any provocation, would serve to show on the part of appellant, malice against the deceased, he being a Mexican.

The appellant also complains that the court permitted the District Attorney to animadvert on the excluded testimony of Sheriff Sparks. It appears that, during the progress of the evidence, the State offered the written statement taken down by Sparks at the time the declarations of the deceased were made to him as to the cause of his death. The appellant objected to said written statement on the ground that no sufficient predicate had been laid for the introduction of said testimony, which was sustained by the court, and the witness withdrawn. In his argu-

ment, counsel for appellant criticised the action of the District Attorney, and criticised the witnesses, Overstreet and Wheeler, and stated that the District Attorney was driven to the use of their testimony, but that he was afraid of the testimony of Sheriff Sparks, who took down the dying declarations. The court, over the objection of the defendant, permitted the District Attorney to state, in his argument, that he was not afraid of the testimony of Sheriff Sparks, that he was not permitted to use. it because of defendant's objection, and that he would then introduce the testimony, and would use it, if the defendant did not object. He then offered the testimony, and on defendant's objection it was again excluded. In our opinion, the course of the District Attorney was justified by the argument of appellant's counsel. See Sinclair v. State, post p. 130, and authorities there cited. Nor, in our opinion, did the court err in authorizing the coat which had been used in evidence to be carried to the jury room. See Jackson v. State, 28 Texas Crim. App., 370; Spencer v. State, 34 Texas Crim. Rep., 238.

The appellant in this case also took several bills of exception to the charge of the court, and he assigns as error the failure of the court to charge threats in connection with the court's charge on self-defense. It is true that there was testimony showing that the deceased had threatened to take the life of appellant if he did not haul and pay for the wood he had cut; but we do not think it was necssssary, in connection with the charge on self-defense, that the court should have called the attention of the jury to the threats that had been introduced in evidence. From the defendant's own evidence, the attack on him by deceased was after the altercation between them had ceased, and he (appellant) had resumed his work of throwing wood in the wagon, when deceased, with a very large knife, rushed upon him, and attempted to cut him with it, cutting his clothes in several places across the front. The appellant, after the attack made on him, drew his pistol, and shot deceased. This attack, from the appellant's testimony, was of a most dangerous and deadly character, and needed no threats to give it force or effect. There could be no misconception as to the purpose of deceased in making the attack, and, if it was true, as testified by him, appellant had the right to slay the deceased, utterly regardless of any threats. The appellant also complains that the court, in its charge on self-defense, failed to give a charge directly applicable to the facts of the case, and insists that the court should have given a charge on an attack by deceased and an abandonment thereof, and a retreat for the apparent purpose of arming himself for a renewal of the attack upon appellant, and that the fatal shots were fired by appellant while deceased was in the act of retreating towards his knife, in order to arm himself with it for the purpose of renewing the attack upon appellant. The court's charge, in this regard, was as follows: "If you believe from the evidence that the defendant killed the deceased, but further believe that, at the time of so doing, the deceased had made an attack on him, which, from the manner and character of it, and the relative strength of the parties, and the defendant's knowledge of the char-

acter and disposition of the deceased, caused him to have a reasonable expectation or fear of death, or serious bodily injury, and that, acting under such reasonable expectation or fear, the defendant killed deceased, then you should acquit him; and if deceased was armed at the time he was killed, and was making such attack on defendant, and if the weapon used by him and the manner of its use were such as were reasonably calculated to produce death or serious bodily harm, then the law presumes the deceased intended to murder, or aimed to inflict serious bodily injury upon, the defendant." This charge, in our opinion, was all that was necessary under the facts and circumstances of this case. The proof on the part of the defendant showed that the attack was a continuous one, and the knocking of the knife out of the hand of deceased, and his immediate attempt to regain it, showed no suspension of hostilities, but, on the contrary, manifested no other purpose than the following up of the attack already made, and the jury could have placed no other construction on the acts of deceased, if they believed the appellant's testimony, and the charge as given by the court, fairly presented the issue to the jury. There was no occasion to give the charge asked. From the evidence introduced by the State in this case, the appellant made an unprovoked assault on the deceased, and of his malice aforethought shot and killed him; while, from the appellant's testimony, he acted in what he did clearly in self-defense. The charge of the court, we think, fully and fairly presented these issues to the jury. They found against the appellant, and we find no such error in the record as authorizes us to reverse this case. The judgment and sentence of the lower court are accordingly affirmed.

*Affirmed.*